AFFIDAVIT

I, Donald J. Henrique, Special Agent, United States Food and Drug Administration, Office of Criminal Investigations, being duly sworn, depose and state:

1. I am a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations (hereinafter referred to as OCI). Prior to my employment with OCI, I was a Special Agent with the United States Department of State for five years. I am authorized and assigned to investigate violations of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. and other federal statutes.

2. During my career with OCI, I have been involved in investigations concerning the illegal distribution of controlled substances and prescription drugs. Specifically, I have been involved in investigations of schemes to dispense prescription drugs without a valid prescription. I am knowledgeable about the legitimate methods of marketing and dispensing prescription drugs, and the manner in which individuals circumvent the legitimate channels of distribution to fraudulently obtain and distribute prescription drugs.

3. The information contained in this affidavit is based on my own investigation, information relayed to me by other federal and local law enforcement agents involved in this investigation, as well as two sources of information and a confidential informant who are more fully described below. This affidavit does not contain all the information obtained during the course of this investigation.

4. I make this affidavit in support of the following:

A. A search warrant for the second floor apartment of [redacted], Providence, Rhode Island, occupied by Anthony Robinson (DOB: [redacted]1963). The

premises are further described as the second floor apartment and common areas of a three-story, multi-family house with a light yellow exterior, white trim windows, and two front doors. Above the mailboxes, affixed next to the front doors, appear the numbers [redacted] A photograph of the building is attached here as Exhibit A. I have observed an exterior camera mounted above the second floor balcony. I have also been informed that there is a surveillance camera above one of the first-floor windows which is not visible from the street.

B. A search warrant for the basement apartment of [redacted] Providence, Rhode Island, occupied by Carol Dipina (DOB: [redacted]1953), as well as the surrounding basement area. The premises are further described as the basement apartment of a three-story, multi-family house with a light yellow exterior, white trim windows, and two front doors. A photograph of the building is attached here as Exhibit A.

5. For the reasons outlined below, there is probable cause to believe that the premises described in Paragraphs 3A and 3B contain evidence, more fully described in Attachment B to this Affidavit, of an ongoing criminal conspiracy to: unlawfully obtain and distribute prescription drugs, in violation of 21 U.S.C. §§ 331(k), 846 (prohibiting the distribution of misbranded drugs); unlawfully manufacture, distribute, and possess with intent to distribute controlled substances, including oxycodone, hydrocodone, and cocaine base, in violation of 21 U.S.C. §§ 841(a), 846; and submit fraudulent claims to health insurance companies, in violation of 18 U.S.C. §§ 2, 371, and 1347.

6. Beginning in approximately August 2007, members of the FDA-OCI Rhode Island Task Force, with assistance from other state and federal law enforcement agencies, commenced an investigation into a scheme to forge prescriptions for the controlled

substances oxycodone, a Schedule II controlled substance (known by the brand name Oxycontin), hydrocodone, a Schedule III controlled substance (known by the brand name Vicodin), and other substances, in order to obtain those prescriptions from pharmacies and then illegally distribute them to customers. Based on this investigation, I believe that there is probable cause to find that Carol Dipina (hereafter referred to as DIPINA), personally and through other individuals, obtains blank Rhode Island Hospital prescription pads; forges prescriptions for various prescription drugs including Schedule II and III controlled substances; submits the fraudulent prescriptions at various pharmacies throughout the Providence metropolitan area; and then sells the drugs in exchange for money or cocaine base. The prescriptions are in the names of individuals who are not the intended users of the drugs. At times, DIPINA utilizes the identity of those individuals to obtain insurance reimbursements (from Medicaid, Blue Cross Blue Shield, and other carriers) for the purchase of the drugs. Based on this investigation, I believe that DIPINA often exchanges the prescription drugs for crack cocaine (the street name for cocaine base) or money which she obtains from Anthony Robinson (hereafter referred to as ROBINSON).

7. As part of my investigation, I obtained the following information regarding ROBINSON:

a. ROBINSON has an active RI driver's license which lists his date of birth as [redacted]/1963 and his address as [redacted], Providence, R.I. 02905.

b. Cox communication subscriber records indicate that telephone number (401) [redacted] is subscribed to ROBINSON at [redacted]. Toll-analysis conducted on ROBINSON's phone showed numerous calls in November 2007 to/from

telephone number (401) [redacted] Telephone number (401) [redacted] is a pay-as-you go cellular phone with no subscriber information. However, it is believed to be used by DIPINA based on the fact that the confidential informant in the case made a number of recorded telephone calls to this telephone number in the presence of law enforcement agents.

c. ROBINSON's Criminal History Record obtained from the State of Rhode Island Department of Attorney General indicates that he was convicted of two counts of manufacturing/possession/delivery of Controlled Substance Schedule I/II and Schedule III/IV in Providence Superior Court on November 14, 2005, and sentenced to six years, four months to serve, 68 months suspended with probation.

d. Surveillance observed ROBINSON drive a green Chevrolet Tahoe to and from [redacted] on several occasions in November and December 2007. Surveillance also observed this car parked in front of [redacted]

8. As part of my investigation, I obtained the following information about DIPINA:

a. DIPINA's Criminal History Record obtained from the State of Rhode Island Department of Attorney General indicates a date of birth of [redacted]1953, the aliases Carol Sheed and Charlene Bryant, and an address of [redacted] Providence RI 02909. Records obtained from the Adult Correctional Institution (ACI) lists DIPINA's address as [redacted]

b. In 1996, DIPINA was convicted of conspiracy to deliver cocaine and sentenced to five years, six months to serve, 54 months suspended sentence with probation. In 1999, DIPINA was convicted of possession with intent to deliver and

conspiracy and sentenced to six years, one year to serve, five years suspended sentence with probation. In 2001, DIPINA was convicted of manufacture/possession/delivery of cocaine 1 oz-1kg. No further information was provided.

c. Information obtained from the ACI indicates that while DIPINA was incarcerated at the ACI she placed a number of telephone calls to ROBINSON. I have listened to one such recorded conversation from September, 2005. During this conversation, DIPINA instructed ROBINSON to obtain two forged prescriptions for Percocet from another associate and submit them to a Providence pharmacy. DIPINA then provided ROBINSON with instructions as to who to call after he obtained the drugs. I know that Percocet is a brand name for the Schedule II controlled substance, Oxycodone/Acetaminophen. I believe, based on my training and experience, and my involvement in this investigation that DIPINA was asking ROBINSON to take over the day to day activities of her drug distribution operation.

d. Information obtained from the Department of Motor Vehicles indicates that Carol M. Sheed (one of DIPINA's aliases), dob [redacted]1953, with an address of [redacted] Providence, R.I., has a suspended license.

e. Surveillance observed DIPINA drive a 1997 maroon Chevrolet Tahoe with a temporary license plate. Surveillance observed this vehicle in front of [redacted] on a number of occasions in November and December 2007 and January 2008.

9. As part of this investigation, I obtained information from a Detective of the East Providence Police Department (EPPD) regarding a September 2007 arrest involving a forged prescription for Oxycontin. I was informed that the EPPD arrested an individual, hereafter referred to as SOI#1 and referred to in the masculine gender, for

attempting to fill a forged prescription for Oxycontin at an East Providence pharmacy. The prescription seized from SOI#1 by the police was forged to reflect an Oxycontin prescription to a relative of SOI #1 on what appeared to be legitimate Rhode Island Hospital prescription paper. Also seized was a Rhode Island Hospital prescription for vicodin in the name of Anthony ROBINSON. At the time of his arrest, SOI#1 was driving the maroon Chevrolet Tahoe that DIPINA has been observed to drive. SOI #1 provided the following statement at the time of his arrest:

a. SOI #1 received the forged prescriptions from a black female, known to SOI #1 as Carol. Carol also provided him with the vehicle.

b. At least ten other people were involved in fraudulently obtaining prescription drugs for Carol. SOI #1 estimated that SOI#1 has personally filled forty forged prescriptions at the direction of Carol.

c. Carol would forge a physician's signature and fraudulently prescribe drugs to the real name of SOI #1 and other individuals related to him. SOI #1 would then utilize his health insurance (or the health insurance of others) to pay for the prescription drugs. FDA-OCI agents obtained records from CVS Pharmacy that demonstrate that SOI#1 obtained 80 mg Oxycontin tablets on at least three occasions in 2007 and hydrocodone tablets on at least four occasions in 2007. Pharmacy records indicated that a number of those prescriptions were purportedly issued by Rhode Island Hospital.

d. After filling a forged prescription, SOI #1 would meet Carol at various locations in Providence, Rhode Island. SOI #1 would then provide Carol with the fraudulently obtained prescription drugs in exchange for $50.00 - $90.00 in U.S. Currency.

e. Based on the information provided to me, as well as other information obtained during the course of this investigation, I believe that "Carol" refers to Carol DIPINA. To my knowledge, SOI#1 did not provide this information in exchange for any promises or benefits. To my knowledge, SOI#1 does not have a criminal history other than the arrest described above.

10. In December 2007, agents involved in this investigation interviewed a second source of information, hereafter referred to as SOI #2 and in the masculine gender. SOI #2 has an extensive criminal history that includes a 1989 conviction for making false statements under oath and a 1998 conviction for robbery. He was arrested in 2007 for false representation to obtain a controlled substance. SOI#2 was incarcerated on that charge at the time that agents spoke to him. SOI#2 admitted to investigators that he has been addicted to cocaine in the past. Agents informed SOI#2 that in exchange for his cooperation they would recommend that he be eligible for early parole. SOI #2 provided the following information:

a. SOI #2 is acquainted with Anthony ROBINSON and Carol DIPINA.

b. SOI #2 has been inside the second floor apartment and third floor apartment of [redacted] Providence, Rhode Island on several occasions in 2007. SOI#2 knew the second floor apartment to be occupied by ROBINSON. When SOI#2 was inside the third floor apartment it was inhabited by DIPINA. (As set forth below, DIPINA has since moved from the third floor apartment to the basement apartment of [redacted])

c. DIPINA has provided SOI #2 with forged prescriptions on Rhode Island Hospital prescription papers on numerous occasions. DIPINA has directed SOI #2 and

others to fill the prescriptions at various Rhode Island pharmacies. According to SOI #2, these prescriptions were often made in the name of SOI #2, thus allowing SOI #2 to utilize his health insurance to pay for the prescriptions.

d. The FDA-OCI obtained records from Blue Cross Blue Shield of Rhode Island indicating that SOI #2 sought insurance reimbursement for at least two oxycodone prescriptions and at least twenty hydrocodone prescriptions in 2006 and 2007. The prescriptions were filled at various pharmacies in and around Providence, Rhode Island.

e. DIPINA paid SOI #2 in both currency and crack-cocaine.

f. SOI #2 named other individuals whom DIPINA uses to obtain prescription medications -- either in person, or by purchasing their identities. I recognized many of the names provided by SOI#2 as individuals who have been identified during the course of this investigation as participants in the conspiracy to fraudulently obtain prescription drugs. SOI#2 has also witnessed DIPINA purchase health insurance information from other individuals.

g. SOI#2 knows that DIPINA obtains crack cocaine from ROBINSON in exchange for prescription drugs. In the summer of 2007, SOI#2 was inside the second floor apartment of [redacted] with ROBINSON, DIPINA, and at least one other individual. SOI#2 witnessed DIPINA clean up a mess that was created by ROBINSON when he "cooked" crack cocaine. On that occasion, DIPINA also gave SOI#2 a small amount of crack cocaine for personal use. I know based upon my training and experience as well as conversations with agents of the DEA that the phrase, "cooking crack-cocaine," refers to the practice of converting cocaine hydrochloride (cocaine powder) into cocaine base (crack-cocaine). I further know, based upon experience and conversations with DEA

agents, that the process requires an individual to use drug paraphernalia, such as glass beakers, pots, sodium bicarbonate (commonly referred to as baking soda), ammonium hydroxide, and a heat source.

11. In November 2007, I and other agents involved in this investigation interviewed a cooperating individual, hereafter referred to as the CI and in the masculine gender. Although the CI had not previously provided information to law enforcement, during the course of this investigation, the CI's information has been corroborated by other sources, my own surveillance and investigation, as well as recorded telephone calls, and audio and video recordings obtained by the CI at my direction. During the course of this investigation, the CI has not been found to provide false or misleading information. The CI has admitted to me that he has abused crack cocaine. The CI has a criminal record, including at least two convictions for possession of controlled substances, and receipt of stolen goods. In addition, he was convicted on several occasions in 2007 for false representation to obtain prescription drugs. The CI was financially compensated for his cooperation in this case. The CI provided the following information to agents:

a. The CI is familiar with DIPINA and ROBINSON. The CI reported that both DIPINA and ROBINSON reside at [redacted] Providence, Rhode Island. The CI indicated that ROBINSON resides on the second floor and DIPINA used to reside on the third floor apartment but has recently moved to the basement apartment of [redacted]

b. The CI had been directed by DIPINA on occasion to steal prescription pads from offices within Rhode Island Hospital. On at least one such occasion, an individual identified by the CI as Lequita Holley served as a "lookout" when the CI went into an

office to steal a prescription pad. A criminal information check revealed that Holley has a criminal history including a conviction in August 2006 for false representation to obtain a controlled substance.

c. The CI has witnessed DIPINA fraudulently purchase health insurance information from other people. The CI has in the past been directed by DIPINA to fill prescriptions using the identity and insurance information of other people. The CI provided me with the names used by DIPINA, and I have verified through insurance and pharmacy records that prescriptions for hydrocodone, oxycodone, and other prescription drugs were obtained under those names in 2006 and 2007.

d. In September 2007, the CI was in the second floor apartment of [redacted] and observed ROBINSON "cooking" crack-cocaine. On that same day, the CI was provided crack-cocaine and a quantity of cash from ROBINSON. The CI has been in ROBINSON's second floor apartment on at least one other occasion with DIPINA, and observed DIPINA retrieve a quantity of crack-cocaine from a hidden compartment inside ROBINSON's apartment.

12. On or about December 11, 2007, investigators met the CI at a pre-determined location. The CI was searched for contraband with negative results. The CI was equipped with an audio and video transmitter/recorder and directed to go to [redacted] to meet with DIPINA. Surveillance observed the CI enter the driveway of [redacted]. The CI reported that he entered the building through a back door and went downstairs to the basement apartment. The CI stated that he met DIPINA and another individual whose identity was known to the CI and separately confirmed by investigators. The CI observed DIPINA and the other person smoke crack cocaine in his presence.

DIPINA, the CI, and the other person left the basement apartment and drove to a number of locations at DIPINA's direction. The CI reported that at one point, DIPINA directed the CI to retrieve a number of prescriptions from DIPINA's bag and hold them while DIPINA was conducting an errand. Following this meeting, the CI met FDA-OCI agents at a pre-determined location and was searched for contraband with negative results.

13. I later reviewed an audio and video recording of these events in order to corroborate the CI's account. The video recording clearly shows DIPINA seated at a table. DIPINA is heard talking to other people inside the apartment and on the telephone. While the audio recordings did not capture all the conversations that transpired during the meeting between the CI and DIPINA, I could hear the following: (a) there was conversation between DIPINA and another individual about "smoking" in front of the CI; (b) there was conversation in which DIPINA instructed another individual to go into the house to get the "papers" in a book, under the kitchen table; (c) there was conversation about individuals who owe DIPINA money for crack; (d) there was conversation regarding the use of health insurance information to pay for "Oxys," which I know to be a slang term for the prescription drug Oxycontin; and, (e) there was conversation about DIPINA using Rhode Island Hospital scripts. I know based on my training and experience, as well my involvement in this investigation, that "papers" is a term that is often used to refer to prescriptions.

14. On or about December 14, 2007, investigators equipped the CI with an audio and video transmitter/recorder and directed the CI to go to [redacted] The CI was searched for contraband with negative results. Agents followed the CI as the CI made his way to [redacted] and observed the CI enter the driveway. Investigators debriefed

the CI after the meeting. According to the CI, the CI again observed DIPINA and others inside the BASEMENT DEN apartment smoke crack cocaine. The CI observed DIPINA open a black binder which appeared to contain numerous prescriptions, prescription refill stickers, lists of doctors and corresponding DEA numbers, and a list of other individuals, including corresponding biographical information. I know that a DEA number is a unique number assigned by the DEA to a medical practitioner, authorized to prescribe controlled substances. During the encounter, the CI informed DIPINA that the CI knew of an individual seeking to purchase Oxycontin. Shortly thereafter, the CI overheard a telephone conversation between "Anthony," who the CI recognized as Anthony ROBINSON, and DIPINA. ROBINSON told DIPINA to "get to work." The CI believes, based on his past interactions with DIPINA and ROBINSON, that this referred to the business of forging and filling fraudulent prescriptions for drugs. The CI reported that he later overheard another telephone conversation between DIPINA and ROBINSON in which they discussed the fact that DIPINA had a customer for the oxycodone. DIPINA told ROBINSON that the pharmacy would not fill the prescription without payment of $1030.00. ROBINSON agreed to pay for the prescription if DIPINA thought she could obtain the drugs without getting caught, and if DIPINA was sure that she had a customer for the drugs. Later, the CI overheard DIPINA and ROBINSON speaking in the hallway. The CI overheard ROBINSON tell DIPINA that the CI was not to be present when DIPINA went to the pharmacy to purchase the oxycodone.

15. The CI also reported that during this meeting, there came a time when DIPINA left the apartment for a short period of time with another person. FDA-OCI surveillance observed DIPINA return to the apartment at the time indicated by the CI.

When DIPINA returned, she carried a prescription bag (a white paper bag with an attached prescription sticker) labeled as Xanax. The bag appeared to contain a pill bottle. DIPINA told the CI that the Oxycontin prescription was voided by the pharmacy. The CI then heard DIPINA answering a call on her cell phone and saying "OK, I'm coming right up." The CI believed this call to be from ROBINSON based on the fact that ROBINSON's apartment is on the second floor of the same building. The CI observed DIPINA leave with the xanax prescription and return a few minutes later with crack cocaine. The CI observed DIPINA provide the crack cocaine to another individual. FDA-OCI surveillance did not see anyone leave [redacted] during this period of time.

16. Following this meeting between the CI and DIPINA, the CI left [redacted] and was met by agents at a predetermined location. The CI was searched for contraband with negative results. The CI was debriefed and the audio and video recording device was retrieved. I have reviewed the video recording and determined that it failed to record properly. I have reviewed the audio recording of the meeting. While not everything that took place during this meeting was captured on audiotape, I was able to hear conversation about the Xanax prescription, the oxycodone prescription being voided, and the telephone call in which DIPINA stated that she was "coming right up."

17. On or about December 17, 2007, investigators equipped the CI with an audio transmitter/recorder and directed the CI to go to [redacted] The CI was searched for contraband with negative results and followed to [redacted] Investigators later debriefed the CI. According to the CI, the following occurred:

a. The CI went to the basement apartment at [redacted] and encountered

DIPINA. The CI observed other individuals arrive and purchase crack cocaine from DIPINA.

b. The CI again informed DIPINA that the CI knew a potential customer for oxycodone. DIPINA instructed the CI to retrieve an orange shoe box from a location in the apartment. I listened to the recording obtained by the CI during this meeting and confirmed that this conversation took place. The CI observed DIPINA retrieve several blank Rhode Island Hospital prescription papers from the box. The CI observed DIPINA forge a number of prescriptions including a prescription for Oxycontin. The prescriptions were written using the names of individuals known and unknown to the CI. Those names were communicated to me by the CI. I was able to verify the existence of these individuals and the fact that prescriptions under those names were filled at various pharmacies and submitted to insurance companies for reimbursement. DIPINA informed the CI that one of the prescriptions would be "free." The CI understood this to mean that the insurance carrier would fully pay for the drug.

c. During this meeting, I placed a recorded telephone call to the CI. I inquired about the Oxycontin prescription and a prescription for antibiotics. I could overhear the CI discussing the antibiotic prescription with DIPINA. I could hear DIPINA inquiring what strength of prescription I wanted.

d. After DIPINA wrote the prescriptions, the CI and another individual drove to a pharmacy in Providence to fill out a number of prescriptions. The CI was under intermittent surveillance by the FDA-OCI as he drove from [redacted] to the pharmacy. FDA-OCI surveillance observed the CI inside the pharmacy. The CI was able to obtain a bottle containing 60 eighty-milligram Oxycontin pills. The CI was not able to

fill the prescription for the antibiotic drug because the pharmacy was not able to validate the existence of the authorizing physician. FDA-OCI agents confirmed with the pharmacist that only the Oxycontin prescription was obtained by the CI. After the CI and the other individual left the pharmacy, law enforcement agents conducted a vehicle stop. Agents detained the CI and released the other individual after verifying his/her identity.

d. Thereafter, the CI turned over a prescription pill bottle to agents containing 60 eighty-milligram Oxycontin pills. The next day, law enforcement agents involved in this investigation returned to the pharmacy, retrieved the forged prescription which was written for a beneficiary who is not the CI, and verified that the prescription was paid for by Blue Cross/Blue Shield of Rhode Island on behalf of that beneficiary.

18. I have been involved in numerous seizures of controlled substances and other illegally obtained prescription drugs. I have been involved in numerous searches of dwellings and buildings out of which illicit drugs have been sold or stored, and in which drug traffickers have resided. I have also had numerous conversations with agents, who have processed or assisted in the processing of clandestine drug laboratories, including basic operations set up to convert cocaine hydrochloride into cocaine base. I have learned of, observed, or seized documents showing dates, names, and amounts, which documents I believe to be drug ledgers; controlled substances and other pharmaceutical drugs; financial records; and keys for safety deposit boxes where the proceeds of drug trafficking could be stored.

19. I know from this investigation that DIPINA and ROBINSON have most likely generated and kept certain documents regarding their illicit activities, such as lists of customers, physicians and their DEA numbers, individuals and their insurance

information, contact information for various pharmacies, prescription pads, records of purchases and reimbursements. I know from this investigation that DIPINA and ROBINSON have a long-standing association and I believe, based on information obtained from SOI#2, the CI, and recorded conversations from the ACI, that DIPINA and ROBINSON have engaged in a continuing conspiracy to distribute unlawfully obtained prescriptions drugs and cocaine base. I also know, based on my training and experience, that prescription drugs, especially when in the form of pills, have a long "shelf" life and may be found on premises long after the expiration date of the drug. I know that prescription pills may be stock-piled, and that they may be kept for a longer period of time than other controlled substances.

20. I further know from my training, experience, and conversations with other agents that drug traffickers, more often than not, keep records containing names, addresses, and telephone numbers of customers and suppliers, and records of amounts of money owed both to and by the drug trafficker in their homes and in other premises used by them. Such records have been found in and seized from properties lived in or used by drug traffickers. Furthermore, I know from my training and experience that occupants of these premises keep on those premises, more often than not, documents and records such as telephone bills, mortgage or rental receipts, mail, photographs, and bank records indicating both occupancy and ownership of those premises. These records are often kept for extended periods of time because they are necessary for the drug dealer's business and also because drug dealers don't always appreciate the incriminatory nature of some of these documents, or simply forget about their existence.

21. I further note, based upon my training and experience, that drug traffickers

oftentimes keep proceeds of their drug sales either in their homes or premises used by them or in safety deposit boxes. They do this to avoid detection of said proceeds by government agencies such as the Internal Revenue Service. Based on my training and experience, I also know that drug dealers oftentimes place assets in names other than their own in order to avoid detection and forfeiture of those assets by government agencies.

22. I know, based on my training and experience, and conversations with other agents, that drug dealers usually maintain paraphernalia for the manufacturing, packaging, cutting, weighing, and distribution of controlled substances, including but not limited to, pots, baking soda, scales, plastic bags, and cutting agents. I know based upon my own training and experience and conversations with past members of the DEA Clandestine Laboratory Team, that persons, who illegally manufacture controlled substances (such as converting cocaine hydrochloride into cocaine base), oftentimes keep controlled substances as well as drug paraphernalia used in the manufacturing process in dwellings resided in or used by them.

23. In connection with this investigation, I received information that ROBINSON may maintain a computer at his home. If that is the case, I also request permission to seize that computer and any items that may contain electronic storage, software, and operating systems that could be used in conjunction with such computer. I do this based on the fact that computers are often used by individuals to maintain electronic records of their business activities, their financial statements, and contact information.

24. As used in the Affidavit, the term "electronic storage" includes "computer software and memory," which refers to digital information that can be interpreted by a

computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word-processing, graphics, or spreadsheet programs).

25. I have consulted with Special Agent Jay Scheurer, a Seized Computer Evidence Recovery Specialist with FDA's Office of Criminal Investigations. SA Scheurer has been a Special Agent with FDA for approximately six years. Prior to FDA, SA Scheurer was a special agent with the United States Department of Education, Office of Inspector General. SA Scheurer has been conducting computer forensics exams since 1997 when he received computer forensics examination training and certification while he was with the Office of Inspector General. He has continued to conduct computer forensics exams as a Special Agent for the FDA's Office of Criminal Investigation. SA Scheurer has received training and has gained experience in the use of specialized computer software and hardware which assists him in examining seized electronic media. SA Scheurer performs dozens of computer forensic exams a year. The training SA Scheurer has received includes Seized Computer Evidence Recovery (SCERS) training provided by the National White Collar Crime Center in1997, and numerous continuing training over the following years. This continuing training covers various topics of computer forensics investigations such as legal issues, software and hardware components, internet and e-mail dynamics, and other computer related topics. SA Scheurer has received additional training for various forensic software and hardware tools that he uses for computer examination and analysis.

26. Based on my discussions with Special Agent Scheurer, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to hard drives can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

27. Also based on discussions with Special Agent Scheurer, I know that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices

that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, the warrant application requests permission to search and seize records that may be stored on a computer. These records constitute evidence of crime, and I believe that, in this case, the computer hardware is a container for this evidence. This affidavit also requests permission to seize the computer hardware that may contain the records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site of the contents of the computer hardware.

28. Based upon discussions with Special Agent Scheurer, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a. The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pages of information. A suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b. Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

29. Based upon the foregoing facts, I believe that there exists probable cause to search the two premises described in paragraphs 3A and 3B above and Attachment A for evidence of violations of 21 U.S.C. §§ 841(a), 846 (manufacture, distribution, and possession with intent to distribute controlled substances and conspiracy to distribute controlled substances); 21 U.S.C. §§ 331(k), 846 (dispensing a misbranded drug and conspiracy); and 18 U.S.C. §§ 371, 1347 (conspiracy and health care fraud), as set forth in Attachment B to this Affidavit which is fully incorporated here.

Donald Henrique
Special Agent
Food and Drug Administration
Office of Criminal Investigation

Subscribed and sworn to before me,

this 28th day of January, 2008 at

Providence, Rhode Island.

DAVID L. MARTIN
United States Magistrate Judge

## ATTACHMENT B: ITEMS TO BE SEIZED

1. Controlled substances including cocaine, cocaine base, oxycodone, and hydrocodone;

2. Proceeds of the distribution of controlled substances and prescription drugs, including: U.S. Currency, money orders, wire transfers, cashier's checks, and personal check.

3. Prescription medications;

4. Drug paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices, as well as common household items that may be used to manufacture, package, or conceal controlled substances;

5. Prescription pill bottles, prescription pads, prescription labels, stickers, and other packaging of prescription medications;

6. Insurance cards or insurance information;

7. Ledgers or papers in any form that contain the names of individuals whose identity has been used to obtain fraudulent prescriptions and insurance reimbursements for prescription medications;

8. Items of personal property that tend to identify the persons who reside, control, or own the location to be searched including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

9. Books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; records relating to controlled substances income and expenditures of proceeds of illegal activity, including but not limited to receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys, and deeds to real and personal property;

10. Any and all paper or electronically stored documents, records, notes, correspondence, e-mails, envelopes, receipts, computer printouts, financial documents, ledgers recording income and expenses, bank statements, saving account records, checking account records, bank deposit slips, bank withdrawal slips, checks, cancelled checks, money orders, cashier's checks, records of wire transfers; safety deposit box records, real estate closing documents;

11. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

12. Records of controlled and non-controlled drug transactions or transactions of materials used in the manufacture of controlled substances, financial, bank records relating to drug trafficking or money laundering of drug proceeds;

13. Cameras and surveillance equipment;

14. Cellular telephones;

15. Keys to any safety deposit box or mail box and documents indicating existence of such a box and its ownership;

16. Computers, electronic storage devices, and any hardware or software necessary for their operation.